School District, 19-3946, Mr. Hoffman. Mr. Hoffman, are you there? I'm sorry, I had to unmute. If it may please the court, Peter Hoffman for the appellate. I'm going to discuss first deference in this matter. In particular, deference as it concerns Dr. Miller, the psychologist who worked both for the school district and for my client, KB, MSB. The court and the SRO should have recognized Dr. Miller as an educator in this matter. And as defined by several of the cases that we listed, ES, Watson, Dorico, EC, and Troy v. KM. Troy v. KM is an interesting case. It said the ALJ found that the district court, the district could not legitimately complain that the expert the district had selected was solely the subject of KM's control. It's the same here. Here we have an expert for both parties. And the expert, Dr. Miller, was training the educators at Katonah Lewisboro. This is not a decision on methodology and can be addressed by the court using its expertise. It need not reply to the SRO in that respect as it concerns a matter that's in the court's own expertise. The SRO refers to Dr. Miller as a private psychologist nearly 20 times and does not once mention the contractual relationship between Katonah Lewisboro and Dr. Miller. But for the failure of the SRO and the district court to determine that Dr. Miller was an expert in this matter, the outcome would be different. Testimony shows that they contracted with Dr. Miller and testimony of the district's own director of special education testified to that and others. Moreover, the district never called a witness to rebut Dr. Miller. The program that Dr. Miller instituted at both the private school and at the public school is a DBT or dialectical behavior therapy program. And it was adopted by KLSD and Katonah Lewisboro in the private school plus 15 other schools and counties. In addition to contracting with KLSD and other public schools, Dr. Miller is an expert in DBT and that's shown in his CD that we've included in the record and his testimony. The district hired Dr. Miller for his expertise. Miller's program was used to sell the parent on bringing SB, the child, back to the school district. Miller and staff monitored the program. Can I just jump in here? This is the judge committee. Sure. The decision we owe the deference to here is the SRO decision on this issue, right? What they said, I thought, at least in part, was that the individualized education program here that the CSE coalesced on didn't require DBT as a necessary ingredient, right? An appropriate educational program for this student, right? And whether DBT was a necessary ingredient of that. I think you're right about that, but I think that that's where the SRO is wrong, Your Honor. In the fact that, in particular for the 2016-2017 school year, if the district and the SRO had credited Dr. Miller as an expert, they would have enforced the state that the program offered by the district was inappropriate because Dr. Miller said that, among other things, like you said, DBT was not as important, but what he said was that the site of the trauma was in returning back to the school. And that's not really addressed by the SRO at all, and the expertise of Dr. Miller in that context would have changed that opinion. But the SRO is saying, look, she's returning to the same school, but to a different program because they now have a DBT set up where they didn't before, and she's going to be in a smaller class size. And it just sounds to me like your objection is to something about the way the SRO labeled Dr. Miller as an expert or something less than that. Where does the purported lack of respect for his expertise actually manifest itself in the decision-making process? Because she never qualifies him in a similar manner to a school psychologist or in a similar manner to a school employee, which she really was. She was a contractor for the school. When you say qualifies him, what does that mean exactly in the context of an SRO hearing? It's a formal recognition or something? But in the context of what it means is that the SRO would have to have deference to Dr. Miller as a trained expert, as a trained educator. And deference meaning the SRO has to accept everything he says? He doesn't have to accept everything, but he should start with that premise, which he never reaches, and calls Dr. Miller a private psychologist over 20 times, never once recognizing that there was a contract between the district and Dr. Miller, never recognizing that Dr. Miller put in a plan at RLS and KLSD and 15 or 20 other schools. So based on that, it's my opinion that he should have been given deference, and then his opinion should have held sway. Let me follow up on that, Mr. Hoffman, because I think this is what animates this committee's questions. You know, you're describing a regime of deference that makes sense to me, for example, in the context of Social Security disability cases, right, where there's a treating physician along the lines of Dr. Miller, and depending on the circumstances, courts will defer to that physician's diagnosis. But here, I think our case law is, but maybe you can correct me if I've been wrong all this time, that as this committee suggested in this question, we defer to the IHO and the SRO. Not to, you know, some physician or some outside expert, but that they, that is the IHO and SRO, have independent significant expertise in this area. And the way that things are structured is that we defer to that significant expertise, you know. Am I right or wrong about that? You're right about that, but let me explain. Based on the facts in this case, the deference that should have been given by the SRO and the IHO to trained educators should have been given to Dr. Miller. The failure or the but-for doing that, they came, the SRO came to a different conclusion than the IHO, who did do that, who did credit Dr. Miller's opinions. And so what I'm saying is, what I'm interposing is that Dr. Miller, based on his contractual relationship with KLSD, actually was the same as a trained educator. He was, in fact, training the educators at Tacoma-Willis-Byrd for the program in 16-17 that the student was proposed to attend. Judge Manasci? Yeah, I have a few questions. So you argue that the district violated its child's client obligation for failing to identify SB in 2015, right? Correct. But you don't seem to be seeking any additional relief based on the failure to identify her in 2015. So can you clarify what difference it would make to your client if the district had done the identification a year earlier? If they had done the evaluation earlier, she may have been provided with special education services as early as, say, June instead of October. Right, but it wouldn't be a denial of the free and appropriate public education. It would be separate services that would be triggered by the identification. Right. Well, I think the entire enchilada, I think, that she would have been denied services through an IEP. But if I could just jump in on that point, which is she's hospitalized in late May, and I thought the hospital was advising that she do no academic work during her stay. So exactly what would the... Her disability is not academic, Your Honor. Her disability is emotional. So that there are things that the committee could have done for her emotionally that were not done during that period of time. I'm not that concerned. Like counseling services or so on. I'm sorry? What would one of those things be? I guess I'm just curious. Counseling, for instance, which is the main thing that she needs. But she's in the hospital in Boston. That's why I don't understand. The district would have sent somebody up to Massachusetts? Or to Ridgeview, or to Wilton, one or the other. As a matter of fact, the district did send personnel up to Massachusetts. When does she get out of the hospital? October 2nd, 2015. Okay, so by then we're already in the next school year. Correct. But I guess there might have been services to help her transition back. Maybe that's your suggestion. Correct. Other than a tutor, which she did receive. Can I ask about the substantial risk of regression over the summer? So what is the evidence that would show that there was a substantial risk of regression? I know Dr. Miller said that there might be, but the evidence seems to suggest that she did okay after being hospitalized for several months and being brought back to school. So what's the evidence that suggests that there was that risk? I think the evidence is that, for instance, when she was not at RLS, which was the time that she was at RLS, which was almost immediately after the time that she left the hospital, she was really not stable in the context of someone who might have not been in the hospital for two months the prior year. And what Dr. Miller and Dr. Farina are arguing is that the likelihood of regression under those circumstances without the structure of RLS would be likely to happen. Was there evidence that she had a breakdown similar to the spring of 2015? No. Okay. I think you said in response to a question a moment ago that you agree that her IEP for 2015-16 didn't call on the school to provide BBT services. Is that right? Correct. It did not really call on the school. I mean, it did. I mean, I guess I'm just curious what this means. I mean, it does say that the school personnel are going to consult with Dr. Miller to support BBT skills and techniques. And it does say that the school is going to do various exercises for coping strategies and so on, which I take it would be informed by BBT. But it sounds like you agree that the school implementing the 2015-16 IEP would not itself need to implement a BBT program. They needed to collaborate with Dr. Miller on, I think, a bi-monthly basis for one hour at a time. The IHO found that that collaboration under the circumstances was not possible. The SRO disagreed. I think that the BBT skills that would be required could not be implemented. And that's what the IHO said as compared to the SRO. Right. But, I mean, they would not have to be specifically trained in the skills to do what Miller said was necessary, to provide what Miller said are the necessary supports, would they? That's what the district and the SRO argues. But the district itself, a year later, or less than a year later, actually at a time simultaneous, was looking into BBT programs and then chose the BBT program where they placed her the following year for the purpose of providing Dr. Miller's program. Right. So you're saying that that reveals that the 2015 program was not adequate. But that would be a problem with the IEP and not with the placement. It sounds like what you're saying is the placement might be consistent with the IEP, but the IEP failed to require a BBT program. Correct. Okay. And then I have another question just about the placement in 2016 to 17. I understand that she'd be going back to the site where she had earlier trauma, but could you just tell me briefly why the accommodations as part of the TSP program wouldn't overcome those difficulties? Well, Dr. Miller was rather expansive about this in the context of the fact that this is where the trauma happened, in addition to which he was concerned that she would be back in the big school, even though the district and the SRO and the district court said that it's in a separate building. It's in the basement of the high school building. The reality is that he was concerned about her return to that social milieu, and he was concerned about the amount of students and the amount of busyness of that situation that would cause her to break down again. Thanks very much. Just committed to everything at this moment. Can you just say a little bit more about why the 2015 placement would have been inappropriate for someone of her academic and cognitive profile? Academically, we're not arguing, but her emotional profile, without the support of people that could collaborate with Dr. Miller and without the idea that people were trained in DBT, would cause her again to be in a situation where she could break down. Okay. Thank you. We'll hear from Mr. Banks and then Mr. Hoffman, you reserved, as I understand it, three minutes for rebuttal. So, Mr. Banks. Morning, this is Stephen Banks for the Cotonou-Louis Union Free School District. I'd like to, may it please the court, I'd like to address the issue that Mr. Hoffman raised about Dr. Miller as being an expert for the district and of deference. I think that is not a correct statement, but factually, legally, factually, the notion that, let me back up. Dr. Miller was in fact retained by the, or at least his firm was retained to provide DBT training, dialectical behavior therapy training for the development of this TSP program. The district never retained him particularly for this student's particular case. He never addressed the Committee on Special Education regarding the student. And the district had to seek parental permission to even speak to him about the student. So, factually, I think it is very inaccurate to say that he was the district's expert for this particular student. And then legally, I don't believe the case law really supports the notion that even if he was somehow considered the district's expert or simply as the student's treating physician, that that would entitle him to deference. The notion of deference is owed to the state review officer primarily, as well as the district in terms of its placement on questions of educational policy, including what is an appropriate placement here. So even if Dr. Miller has his own concerns and would do something different, that would not carry the day and simply require that the district follow his particular recommendations. To the extent it could, the Committee on Special Education did consider his concerns, particularly after they got permission to speak with him. And those concerns were addressed by the state review officer, and based on the totality of the circumstances, found that his concerns were not an appropriate basis to find that the district was not providing the student with the appropriate placement. The IDA in itself is largely prospective. The Committee on Special Education, its obligation is to come up with and devise a program that's reasonably calculated to lead to educational progress. And in this case, the SRO properly reviewed the records and the information and determined that the committee did just that and did provide the student with appropriate place. Thank you, Judge. Judge Committee? There was testimony that I think Judge Seibel referred to regarding the 10th grade class. I can't tell if it was the class before her or the class that she would have been in, and the extent to which that was a match for her cognitive and academic profile. Can you just talk about whether there was adequate evidence that CARFIN was an appropriate match for 2015 in light of that testimony? I think the committee itself at the time it devised the individualized education program heard from the director of CARFIN, who specifically told the committee that it could work with Dr. Miller in support of his provision of DBT therapy. The school could provide all the supports for the student. What I'm talking about, though, is not so much what services they might have been able to make available as the question of what kind of a class environment she would be in. And so there was the record evidence that some of the kids in what might have been her class had full-scale IQ scores. I think the testimony was in the 70s that there was perhaps an autistic child screaming. And yet this is a child who the record shows is a talented writer who's academically a high achiever across a variety of subjects. So what was the evidence in the record that her peers would be a match for her for where she was, both emotionally and academically? All of that was, I think, addressed by the director of CARFIN at the time. It spoke with the CSC, the Committee on Special Education. And he represented, as far as I remember, that the student would be placed in an appropriate program with the class groupings that matched her profile, and that the issues with the other students would be in other classes and would not be instructionally grouped with this particular student. As for the student whose parents reported hearing screaming at their visit, I don't know if that's ever been contradicted, but that would not be a basis given all the information that came from CARFIN, its commitment to provide the student with services in the IEP and to work with Dr. Miller not to find it an appropriate placement. Thank you. Jake Namashe? Well, at this point, the IHO said that CARFIN wouldn't be able to support the DBT skills training. It does seem to me that the IEP from that year said that they're supposed to work with Dr. Miller to support DBT skills and techniques, and then they are supposed to provide social, emotional, behavioral supports dedicated to coping and so on, all of the stuff that's related to DBT skills. And it does seem like there wasn't any training on the part of the staff there in DBT. So why isn't that – why doesn't that demonstrate that they would not have been able to provide the support to Dr. Miller's program that the IEP itself calls for? Again, these are issues that were fully considered by the SRO, but I will say that neither the school nor Dr. Miller said that the two parties couldn't collaborate, do the work necessary to support the provision of DBT therapy by Dr. Miller to the student. The Committee on Special Education referred back to the discharge summary from the hospital that – But in the next year, as the opposing counsel just said, the next year, the committee then said, well, actually, she should get DBT training, and they referred her to a different program. I mean, doesn't that show that what they had expected the first year wasn't appropriate? No, not at all. The student, at the end of her hospitalization, was given specific recommendations in her discharge summary that provided for therapeutic supports, emotional supports in the educational setting, as well as certain academic accommodations, such as extended time on tests. I don't believe from the discharge summary, and certainly I've argued it elsewhere, it does not contain any reference to the school itself providing DBT therapy, but she does need the therapeutic supports, emotional supports. And in – for the second – She's supposed to have twice weekly one-on-one counseling and weekly group counseling, right, in addition to the DBT therapy with Dr. Miller. But CARFIN had only one psychologist on staff for 70 students. I mean, isn't there a question there about its capacity to provide what even the IEP calls for? I don't think so. You know, the – CARFIN did present a program. It is a therapeutic support program. And I would go again back to that – the nature of the placement. This is a question of educational policy that certainly the SR completely reviewed and considered and did find that CARFIN was an appropriate program placed on all of the information. And it certainly did provide information that it supported therapy by other students, including students who had similar emotional needs, had in fact been, you know, hospitalized in the past. So I don't think it's appropriate. Can I ask you about this child find question? So in the spring of 2015, S.V. cut herself twice and had this suicidal ideation and was hospitalized. I mean, why wouldn't that have put the school district on notice that she needed to be identified for special education services? Because there are a lot of things that go in – you know, the child find, under the case law, the school district can't ignore clear signs that a student may have a need for special education. But here in this particular student, she was a strong student. She remained a strong student throughout that school year. She was not absent for a long period of time. Even the cutting episode was – the marks were superficial and minor and had been healing. So there is certainly information there. That makes it not a clear sign, you're saying? It's not – it's an indication that this student may have emotional needs. It's not an indication that this student had a particular need for special education services or should have been classified. And as that time – you know, as time went by, the amount of time between that first, you know, week notice, the first minor sign where she was found to engage in self-cutting to the time she was hospitalized in May, was very condensed and would not have given the district – you know, certainly the information developed during that time frame was not such that the district would understand. By the time she's hospitalized, the school district appreciates that she requires special education services, right, and these extra supports. No, no. Sorry, I mean after she's hospitalized, you come to that conclusion. After she's hospitalized, yeah, exactly. Right, you come to that conclusion. So then I guess my question is if you recognize that they're traumatic or have led to these problems, why isn't the fact that she's being returned – that in, what is it, 2016 to 17 she'd be returned to the environment in which the trauma occurred, why isn't that enough for us to conclude that that doesn't seem consistent with providing the required emotional support? You mean the placement in the therapeutic support program at the – At John Jay, right. Yeah, the record does, you know, deal with that. The SRO certainly dealt with that. The – she was going – she was – the placement would have – Well, the SRO says you can't just assume that they're not going to help her through it, which fine, you shouldn't assume it, but isn't it pretty straightforward that taking whatever support she's going to be given, she's going to fare worse at the site of the trauma than she would in a different environment? I don't know if that conclusion can be completely – you know, it can be accepted. I do think you have a program that the district developed with trained staff, with flexibility, with small classes, with academic supports, and the district certainly had every reason to believe that with those additional supports, the student could come back to the school. They also proposed a transition program, and I think, you know, I think the SRO correctly pointed, you can't compare a time where the student was receiving no services to a time where the student is receiving services. I think to argue otherwise is really placing too high a burden on the district. The district, you know, has an obligation to come up with a reasonable plan, and it did so for that school year. Thank you, Ms. Banks. Mr. Hoffman, you've got two minutes for rebuttal. Mr. Hoffman? If you're trying to speak, we can't hear you. Ms. Rodriguez? Yes, Judge, I do see Mr. Hoffman connected to the call. Mr. Hoffman, can you speak? Yes, I can. I'm sorry. I thought I was unmuted. The district twice asked for Dr. Miller's opinion on the concerns that he had for SB returning to the school district. Twice he met with different psychologists and supplied a letter why it wasn't appropriate for SB. So the district, to say that they don't rely on or that there's some way that the district didn't rely on Dr. Miller as an expert, is belied by the fact that they twice sought to speak to him and requested a letter. And then on another occasion, in the 15-16 school year, relied on him to do consults with a school that wasn't prepared for CBT therapy. You were right to ask about the Fisk scores in the 70s and the autistic child. There was no evidence whatsoever that Carrigan was going to separate SB from the children with the lower IQs and or the autistic child. In particular, the lower IQs were the class profile for the class that SB was going to be in. The district largely agreed that CBT was necessary. Going back to child crime, which I don't want to spend a lot of time on, the district and the SRO and the district court totally minimalized the emotional sequela that this child went through and is still going through. The reality is that for a social worker to say that hospitalization is not enough to say that a disability is suspected, which is the law, is remarkable and shows the lack of care that was put into SB between April of 2015 and October of 2015. I have nothing else. The only other thing I have is, I have one other thing. The district cites a case in EM for the purpose of remanding this, if you agree with me. I don't think this should be remanded. I think that if you read the entire section of the case in EM, you'll see that they said that there was no record to review because the IHO had not addressed the issues that were in play. Thank you, Mr. Hoffman. Thank you very much. We'll reserve the decision. That concludes today's oral argument calendar. I'll ask the clerk to adjourn court. Thank you. Court is adjourned.